GUGGISBERG *v.* OTSEGO COUNTY CO-OPERATIVE ASSN.

1. PRINCIPAL AND AGENT—CREATION OF AGENCY—GRATUITOUS AGENT.
   Where owner of potatoes in storage, on being shown letter of inquiry by defendant, authorized latter to sell to writer at price offered, agency was created, although defendant's action in relation to transaction was voluntary; he having no business connection with storage plant.

2. Same—Agent Should Notify Principal of Unforeseen Conditions.

Ordinarily, where unforeseen conditions arise, agent should notify principal and procure additional instructions.

3. Same—Duty of Gratuitous ·Agent—Liability.

It was duty of gratuitous agent, who had been authorized to sell potatoes to certain buyer at certain price, on discovering that shipment could not be made to said buyer, to so inform his principal, so that advantage could be taken of market demand and sale be made to others, and his failure to do so rendered him liable to principal for resulting loss.

Appeal from Otsego; Smith (Guy E.), J. Submitted January 29, 1932. (Docket No. 222, Calendar No. 36,219.) Decided June 6, 1932.

Case by John C. Guggisberg against Otsego County Co-operative Association, a Michigan corporation, and others for breach of agents' duty in the sale of potatoes. Judgment for plaintiff. Defendant Lytle appeals. Affirmed.

*James F. Shepherd,* for plaintiff.

*Arthur W. Penny,* for defendant Lytle.

Sharpe, J. The plaintiff stored about 800 bushels of potatoes in the warehouse of the defendant co-operative association in the fall of 1929. He had paid therefor the sum of $1,465.65. In January, 1930, he spoke to the defendant Lytle, who was at that time the county agricultural agent, about the prospects of selling them. In March, plaintiff was called to the association office by Lytle. The defendant Menzies, the association manager, was also present. Lytle there exhibited a letter sent to him by Ira H. Zimmerman. The plaintiff testified:

"*A.* Mr. Lytle showed me that letter and said that he had done business with that man before, if

I wanted to get that amount, $1,516, after everything was deducted, storage charges and selling charges, all told, if I wanted to sell to that man on open account I could receive that much money for the potatoes; and I then asked him if it was the best that could be done. He said it was. I said, 'Then, sell the potatoes to Mr. Zimmerman,' which he said he would. He sat down and he figured it out three different times on three different pieces of paper and said every one of them came out the same figures, and finally he showed me one, and he said that was the best price they could get for them, $1,516 for the total amount of the potatoes.

"*Q.* Anything else occur at that time?

"*A.* He made the statement to me he did not want them sold through the Top O'Michigan Seed Growers, that they would have to be sold directly between this man Zimmerman and himself. Mr. Lytle said that."

The defendant Menzies, called for cross-examination, testified:

"*A.* Mr. Lytle and Mr. Guggisberg talked about this particular letter.

"*Q.* What was said there, Mr. Menzies?

"*A.* Well, I think that Mr. Lytle explained to Mr. Guggisberg these potatoes would be sold through Mr. Zimmerman if arrangements could be made to properly do it, so the billing—the potatoes were to be shipped open billing.

"*Q.* That was not the usual way of shipping, was it?

"*A.* The seed company used to pass upon the shipments.

"*Q.* What was said about the price?

"*A.* I do not remember exactly the amounts or the prices that he did get, but I think that Mr. Guggisberg's statement is correct.

"*Q.* Was there a computation made there in regard to the amount that Mr. Guggisberg was to re-

ceive after payment of storage charge and handling and loading?

"*A.* I think $1,516 was mentioned at the time.

"*Q.* Whether or not that was the balance that Mr. Guggisberg was to have for his potatoes, is that your recollection?

"*A.* It is, as to the net amount owing to Mr. Guggisberg on that particular deal."

The defendant Lytle, in his own behalf, testified:

"*A.* Concerning this letter, I stated to Mr. Guggisberg that the market for certified seed potatoes had slid off, and whether or not it would be possible for me to help him get his money back, I did not know, but that this letter perhaps provided an avenue for the sale of these potatoes so he might get his money back.

"*Q.* What did he say?

"*A.* I asked him whether he cared to accept this order as a place for the marketing of his potatoes, knowing that they would have to be shipped on open billing, and he said, 'As far as that is concerned,' neither accepted or rejected it, but did make the remark finally, 'Do the best you can, boys, if you are not able to make it, you will find me a good loser.' * * * At the conference among the three of us, I did not tell Mr. Guggisberg he was to receive $1,516 in round numbers for these potatoes. There was no price mentioned."

On cross-examination, he stated that "No price was set on the potatoes he had." He was then asked, "Was any figures mentioned?" and answered, "The matter of $1,516 was mentioned." A memorandum slip in the handwriting of defendant Lytle, showing how the sum of $1,516 was arrived at, was put in evidence. It appears that the Zimmerman letter referred to other potatoes. This fact was

discovered by Menzies a few days later, and he advised Lytle about it, and the Zimmerman order was filled by the Top O'Michigan Seed Growers pursuant thereto. No information relative thereto was communicated to plaintiff by either Menzies or Lytle.

Plaintiff's potatoes were afterwards shipped to parties in Detroit by the Top O'Michigan Seed Growers, and the amount due him was computed on a pool rate of the price secured on all the potatoes handled by the association. Plaintiff was paid $700 on account in a check of the co-operative association, and later, in July, a check of the seed growers' company for $475.32 was tendered to him by the defendant Lytle in full settlement of his claim, and refused by him. He was then for the first time informed that his potatoes had not been sold to Zimmerman. He thereafter brought this action to recover the balance claimed to be due him, and, on trial before the court without a jury, had judgment against all of the above-named defendants for $864.80, from which the defendant Lytle has taken this appeal.

Stress is laid upon the fact that Lytle had no business connection with either of the defendant companies, that he was not engaged in selling potatoes, and that what he agreed with plaintiff to do was but a voluntary act on his part, for which he was to receive no compensation. Plaintiff was not a member of either of these companies, and it does not appear that he had any information, or was in any way notified, of Lytle's relation to them. He was permitted to store his potatoes in the warehouse of the co-operative association, and was liable for the storage charges when they should be removed. These and the charges for "handling and loading," as testified to by Menzies, were taken into considera-

tion when computing the amount plaintiff should receive on the sale to Zimmerman.

It seems clearly established that, under the arrangement made, Lytle was authorized by plaintiff to ship his potatoes to Zimmerman. Plaintiff's assent thereto in effect transferred his right to the possession of the potatoes to Lytle. An agency was thereby created.

"Loyalty to his trust is the first duty which an agent owes to his principal, and without it the perfect relation cannot exist." *McLennan* v. *Cole* (syllabus), 224 Mich. 225.

"It is the duty of an agent to communicate to his principal facts relating to the business which ought in good faith to be made known to the latter." *Michigan Crown Fender Co.* v. *Welch* (syllabus), 211 Mich. 148 (13 A. L. R. 896).

"Ordinarily, where unforeseen conditions arise, the agent should notify the principal and procure additional instructions." 2 C. J. p. 718.

"If the agency is gratuitous the agent will not be liable for a nonfeasance if he never entered upon the service expected of him; but if the agent once enters upon the execution of the business and any loss results from his neglect or failure to carry out his instructions, he may be held responsible." 2 C. J. p. 717.

Liability is not here predicated upon his nonaction or accident or mistake, but upon his neglect and breach of duty. If a gratuitous agent, as he claims he was, it was surely his duty to inform plaintiff that shipment could not be made to Zimmerman, and his neglect to do so, when so advised by Menzies, was inexcusable. Plaintiff's loss may be said to have been attributable thereto. There was then a

market for these potatoes, and it may be assumed that, had plaintiff been so informed, he might have disposed of his potatoes to others for the net price fixed at that time. The record contains no other evidence of their then value. The price at which they were sold to the Detroit parties in April does not appear in the record. That which plaintiff was offered therefor, as before stated, was the pool rate for all potatoes sold by the association for its members.

That Lytle realized he had breached the duty he owed plaintiff is apparent from his effort to induce plaintiff to settle for the check for $475.32 which he tendered to him. It is urged that it is unfair to Lytle to award a judgment against him for the full amount due plaintiff when the seed growers' company has the amount of this check in its hands and it is admittedly due him. Lytle might have avoided this situation by the unconditional delivery of the check to plaintiff. Its application on the judgment is a matter of adjustment among the several defendants.

We are not here concerned with the liability of the other defendants. Lytle alone has appealed, and, in our opinion, the judgment rendered against him should be affirmed.

CLARK, C. J., and McDONALD, POTTER, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.